IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TONY E. LOVE and ELLEN E. LOVE,

Plaintiffs,

vs.                                    Case No. 05-1089-JTM

J.R. JOHNSTON, and JERRY BALLINGER,

Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the defendants' Motion for Summary Judgment

(Dkt. No. 12).  The only issue before this court is whether defendants are entitled to qualified

immunity.  After reviewing the parties' arguments, the court finds that defendants are entitled to

immunity and thus grants defendants' Motion for Summary Judgment.

## I. FINDINGS OF FACT

At all times relevant to this matter, J.R. Johnston acted within the course and scope of his

employment as a Sergeant employed by the Augusta Department of Safety.  At all times relevant

to this matter, Jerry Ballinger acted within the course and scope of his employment as a Safety

Officer employed by the Augusta Department of Safety.

### A. Initial Incident

On February 6, 2004, Johnston was dispatched to a possible disturbance at an apartment

in Augusta, Kansas.  After arriving at the scene, Johnston found Ramonda E. Love (Ramonda)

and her grandson, Charles L. Kingsley (Kingsley), in the apartment.  Ramonda was 75 years old

at the time.  She is the mother of Tony E. Love (Tony) and Linda B. Dieter (Dieter).  Dieter is

Kingsley's mother.  Kingsley lived in the apartment with Ramonda.

Kingsley informed Johnston that there was a family disagreement as to who had been

properly appointed as attorney-in-fact over the affairs of Ramonda. Specifically, both Tony Love

and Linda Dieter claimed to have legal control over their mother's affairs.

While Johnston was at the apartment, Dieter called and later arrived at the scene. Dieter

informed Johnston that she was Ramonda's attorney-in-fact and that Tony had recently

improperly obtained Ramonda's signature on a document purporting to revoke the appointment

of Dieter and to appoint Love as attorney-in-fact. Dieter claimed that Ramonda lacked the mental

capacity to execute this document.

Johnston spoke to Ramonda and found that she was capable of answering simple

questions such as her name, but was confused by more in-depth questions about her caregiver

and doctor.  He then allowed Dieter to take Ramonda to a previously-scheduled appointment

with her physician, Tracy M. Baker, M.D.

While Johnston was still at the apartment, Tony Love called and spoke to Kingsley, who

then gave the phone to Johnston. Tony stated that he had been properly appointed by his mother

as her attorney-in-fact and claimed to have documents substantiating his appointment and the

revocation of Dieter's prior appointment. Johnston asked Tony to bring the documents to the

Augusta Department of Safety station.

Tony complied with Johnston's request and came to the station where he provided

Johnston with a Revocation of Power of Attorney and a General Power of Attorney, both signed

by Ramonda on February 2, 2004. Johnston reviewed the documents and advised Tony that this was a civil matter and that he would follow Tony to the apartment to make sure there was no disturbance.

When Johnston and Tony arrived back at the apartment, no one was there.  Tony informed Johnston that he was concerned that Dr. Baker would have Ramonda admitted to LakePoint Nursing Home. Johnston called the administrator of LakePoint, defendant Kevin Unrein. Unrein informed Johnston that Ramonda had, in fact, been admitted there by order of Dr. Baker, and that because Ramonda was now in LakePoint's care and was not mentally competent, he did not believe he could legally release her unless ordered to do so by a judge.  Although it was Johnston's understanding on February 6, 2004, that Ramonda had been admitted to LakePoint at the order of Dr. Baker, it is unclear whether Ramonda went to LakePoint voluntarily or by the medical order.

Johnston again informed Tony that this was a civil matter and that Tony needed to contact an attorney for assistance in resolving the dispute. Johnston also cautioned Tony not to cause any disturbance at LakePoint. Tony indicated that he understood.  Tony followed this advice.

**B. No Trespass Orders**

On February 9, 2004, Unrein contacted Johnston and informed him that Tony had attempted to remove Ramonda from LakePoint without permission. Johnston contacted M.A. Knowles (Knowles), an officer with the Augusta Department of Safety, and dispatched Knowles to the scene.

After Knowles arrived at the scene, he initially obtained information from Unrein. According to Unrein, Tony had arrived at LakePoint and indicated that he wanted to take

3

Ramonda out. Unrein informed Tony that Tony would have to complete certain documents to do so. Tony agreed. As Unrein went to get the documents, Tony removed Ramonda and placed her in a vehicle driven by Tony's wife, plaintiff Ellen E. Love (Ellen). When Unrein became aware of the situation, he grabbed Tony, but Ellen drove off with Ramonda. Unrein then contacted Johnston. Despite disagreements regarding the sequence of events, Unrein informed Knowles that: 1) Tony and Ellen improperly removed Ramonda from LakePoint; 2) Tony had to be physically removed from his vehicle; and 3) Ellen improperly drove away with Ramonda.

After hearing Unrein's account of the events, Knowles obtained information from Tony. Tony advised him that he believed he had the right to remove Ramonda because he was her attorney-in-fact. The parties dispute whether Tony showed Knowles the Revocation of Power of Attorney and General Power of Attorney forms signed by Ramonda. Regardless, Tony and Knowles discussed the forms.

Knowles was aware of the dispute over the validity of the Revocation of Power of Attorney and General Power of Attorney and was aware that Ramonda had been admitted into LakePoint. Knowles and Tony went to the apartment where Ellen had taken Ramonda. Knowles advised Ramonda of what was happening and that he was taking her back to LakePoint. Although the parties dispute the sequence of events and Knowles' actual words during their interaction on February 9, 2004, plaintiffs admit that Tony was told that: 1) he needed to have an officer present if he went to LakePoint; 2) he was interfering with Unrein's activities at LakePoint; and 3) he needed to resolve his dispute with Dieter by proper legal means. Knowles later reiterated his warning regarding criminal trespass. The parties controvert whether Ellen Love was ever told by either a police officer or the administrator of LakePoint that she was

4

barred from the facility.

On the same date, Dr. Baker faxed a letter to LakePoint advising that it was her medical opinion that Ramonda lacked mental capacity to have validly signed the Revocation of Power of Attorney and General Power of Attorney.  Knowles obtained a copy of this letter and included it with his report.

**C. The Arrests**

On February 21, 2004, at about 8:30 p.m., Ballinger and Johnston were dispatched to LakePoint along with Augusta Safety Officer Johnny P. Yelverton (Yelverton).  The officers were advised that Tony and Ellen were on the premises in violation of the no trespass orders that Knowles had given.

Upon arriving at LakePoint, the officers obtained information from Unrein.  Unrein stated that plaintiffs had previously been given verbal no trespass orders, yet they were on the premises. Plaintiffs were both inside the LakePoint facility when the officers arrived.  Plaintiffs told Ballinger and Johnston that they had obtained an order from the court granting temporary custody of Ramonda to Tony and were on the LakePoint premises to deliver a copy of the order to a LakePoint representative.  The Butler County District Court had issued the order. Tony alleges that he went to LakePoint to inform those who administer the facility of his appointment in order to establish his right to look after his mother while she was a LakePoint resident.  However, the Preliminary Orders provided for Gail A. Jensen to make service upon Ramonda. The Loves gave Johnston a copy of said order, titled "Preliminary Orders.".

Johnston called Knowles and confirmed that plaintiffs had been given no trespass orders on February 9, 2004, and that plaintiffs had been instructed that they could not be on the

5

LakePoint premises without an officer.  Johnston understood that the no trespass orders applied even if Tony obtained a court order of guardianship over his mother.  Ballinger placed Tony under arrest. Yelverton placed Ellen under arrest.  Police officers transported plaintiffs to the Augusta Department of Safety where they were processed, given court dates and bonded.  City officials charged both plaintiffs with criminal trespass in Augusta Municipal Court.  On March 3, 2004, the City of Augusta voluntarily dismissed the charges.  Plaintiffs filed the present action on March 31, 2005.

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998).   The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed.

R. Civ. P. 56(e)) (emphasis in <u>Matsushita</u>).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

## III. ANALYSIS

Defendants raise two arguments in support of the motion for summary judgment.  First, defendants argue that plaintiffs' malicious prosecution claims are time-barred.  Since plaintiffs indicate that they are abandoning their claims of malicious prosecution, the court need not address this issue.  The only remaining issue before the court is whether Johnston and Ballinger are entitled to qualified immunity for their arrest of the Loves.

A public official performing a discretionary function enjoys qualified immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The immunity is "immunity from suit rather than a mere defense to liability." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).

Where defendants raise a qualified immunity defense, plaintiffs bear the burden of showing that defendants' action violated a federal constitutional or statutory right and that right was clearly established at the time of plaintiffs' arrest.  <u>Nelson v. McMullen</u>, 207 F.3d 1202, 1205 (10th Cir. 2000).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  On the other hand, if a violation has been shown, the next step in the qualified immunity sequence is to ask whether the

constitutional right was clearly established.  Id.  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition...." Id. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation."  Id. at 202.

In the context of a warrantless arrest, defendants are "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff."  Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995) (quotation omitted).  "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation marks omitted).  Even reasonable but mistaken conclusion as to probable cause entitle law enforcement officials to immunity.  Romero, 45 F.3d at 1476.   Some courts have termed this "arguable probable cause."  See Cortez v. McCauley, -- F.3d -- , 2006 WL 308260, at *4 (10th Cir. Feb. 10, 2006); Jones v. Cannon, 174 F.3d 1271, 1283 n. 3 (11th Cir. 1999). "Therefore, when a warrantless arrest or a seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." Cortez, -- F.3d -- , 2006 WL 308260, at *4.  The Tenth Circuit notes:

> This principle may appear to be in some tension with the equally established principle that "it is a jury question in a civil rights suit whether an officer had probable cause to arrest." DeLoach v. Bevers, 922 F.2d 618, 622 (10th Cir.1990), cert. denied, 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991). The tension is resolved in this case by the essential lack of dispute over the historical, predicate facts. The parties agree on the "what happened" questions. In such a circumstance, for qualified immunity purposes there is no such thing as a "genuine issue of fact"

8

as to whether an officer "should have known" that his conduct violated constitutional rights.  See Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000).

Cortez, -- F.3d -- , 2006 WL 308260, at *5.

In Kansas, a criminal trespass requires:

> (1) Entering or remaining upon or in any land . . . by a person who knows such person is not authorized or privileged to do so, and:
> (A) Such person enters or remains therein in defiance of an order not to enter or to leave such premises or property personally communicated to such person by the owner thereof or other authorized person.

Kan. Stat. Ann. § 21-3721(a).  An officer may make an arrest when he or she believes a crime has been or is being committed.  Kan. Stat. Ann. § 22-2401.  In a private facility, there is no general right of access to the facility and their privilege of entering the premises could validly be limited or revoked.  People v. Marino, 515 N.Y.S.2d 162, 166 (1986) (noting that a nursing home is a quasi-private facility).

In reviewing the findings, the court finds no genuine issue of fact. While plaintiffs disagree as to the sequence of certain events, they do not dispute the material facts for purposes of determining qualified immunity.  See Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000).

As a preliminary matter, Knowles had sufficient basis for issuing no trespass orders. On February 9, 2004, the Loves attempted to remove Ramonda by misleading LakePoint staff. Knowles issued verbal no trespass orders and returned Ramonda to LakePoint. The officer had been clear that the Loves needed law enforcement presence to be on LakePoint grounds. Plaintiffs do not challenge the validity of the no trespass orders, though they disagree as to its scope.

9

Based on Johnston's understanding of the no trespass orders, he had sufficient basis for believing that on February 21, 2004, an offense had been committed warranting arrest.  First, Johnston was aware of a dispute over who was the attorney-in-fact of Ramonda based on his February 6 encounter with Tony Love and his sister.  Second, Johnston was generally aware of the events at LakePoint on February 9 when the Loves attempted to remove Ramonda.  Third, during Johnston's February 21, 2004 dispatch to LakePoint, Unrein made Johnston aware that the Loves had received a verbal no trespass orders.  Fourth, Johnston confirmed with Knowles that plaintiffs had been instructed that they could not be on the LakePoint premises without an officer. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998) citing Albright v. Rodriguez, 51 F.3d 1531, 1536 (10th Cir. 1995) ("Officers may rely on information furnished by other law enforcement officials to establish reasonable suspicion and to develop probable cause for an arrest.").  Johnston understood that this was the case even if Tony obtained a court order of guardianship over his mother.  Finally, Johnston found the Loves at LakePoint without an officer present, which was in violation of the no trespass orders.  Johnston received consistent information from Unrein and Knowles on which he could reasonably rely.  United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004).  Under these circumstances, Johnston had probable cause to arrest the Loves based on his understanding of the prior no trespass orders. Johnston's direction to Ballinger to arrest Tony Love is also entitled to qualified immunity since it was based on Johnston's understanding of events.  See Oliver v. Woods, 209 F.3d 1179, 1190 (10th Cir. 2000) ("Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest.").

10

Plaintiff Ellen Love disputes whether there had ever been verbal no trespass orders communicated to her.  However, the court does not need to address this issue directly. For purposes of qualified immunity, the issue was whether the facts known to Johnston and Ballinger were sufficient to establish probable cause for her arrest.  Since Johnston had received information that no trespass orders were in effect for both Tony and Ellen Love, he could reasonably rely on this information in determining whether there was probable cause to arrest them both.  There is no indication that the information was not trustworthy from the perspective of a reasonable police officer.  Defendants had arguable probable cause, even if they may have been mistaken.  Romero, 45 F.3d at 1476 (10th Cir. 1995); Cortez, -- F.3d -- , 2006 WL 308260, at *4.  The fact that the city dismissed the charges upon which the Loves were arrested is not relevant to the issue of probable cause.  Beard v. City of Northglenn, 24 F.3d 110, 114 (10th Cir. 1994); Jenkins v. Keating, 147 F.3d 577, 585 (7th Cir. 1998).

Plaintiffs' response is devoid of legal support refuting a claim of qualified immunity in this case.  The Loves' reasoning rests on the ground that the Preliminary Orders appointing Tony as temporary guardian of his mother somehow trump the no trespass orders.  Further, plaintiffs seem to argue that they provided officers notice of their right to be at LakePoint by virtue of the Preliminary Orders.  See Cortez, -- F.3d -- , 2006 WL 308260, at *2 (citations omitted) ("Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful.").  First, plaintiff cites no authority to support the conclusion that the court order superseded the no trespass orders.  Even if the court construes the Preliminary Orders as identifying a clearly established right, this ignores the fact the officer also had knowledge of a conflicting no trespass orders.  Faced with two directives, a

11

reasonable police officer would not know that his conduct was unlawful, particularly if he believed the no trespass orders applied even if there was a court order of guardianship. Thus, it is difficult to discern a clearly established right.  Furthermore, in light of the events surrounding the February 6 and 9 contact with law enforcement, Johnston and Ballinger had a reasonable basis for enforcing the no trespass orders.

The court disagrees with plaintiffs' assertion that summary judgment in favor of the officers implies that officers may independently establish rules.  It is well established that officers who violate a clearly established constitutional right are not entitled to qualified immunity. In this case, it is questionable whether such a right existed since there were no trespass orders, which officers confirmed before making an arrest.  The case law is clear that even if the officer's understanding of the parameters of the no trespass orders is mistaken, the officers should be afforded immunity when the reliance is reasonable.  The court finds defendants' decision to arrest plaintiffs reasonable and supported by probable cause.  Plaintiffs have failed to overcome defendants' claim of qualified immunity, and thus the court finds in favor of defendants.

IT IS ACCORDINGLY ORDERED this 14th day of March 2006, that the court grants defendants' Motion for Summary Judgment (Dkt. No. 12).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE